## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEFFREY LYONS

                 **Plaintiff**

    **v.**

GERHARD'S INC., *et al.*

                 **Defendants**

**CIVIL ACTION**
**NO. 14-06693**

**PAPPERT, J.**                                        **JULY 15, 2015**

### MEMORANDUM

Plaintiff Jeffrey Lyons ("Lyons") sued Gerhard's Inc. and its principal owners (collectively, "Gerhard's") pursuant to the Fair Labor Standards Act ("FLSA"), the Employee Retirement Income Security Act ("ERISA"), the Pennsylvania Minimum Wage Act ("PMWA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").  (*See* Compl., Doc. No. 1.) The core of Lyons' claims is that Gerhard's misclassified him as an independent contractor, thereby depriving him of overtime pay and other employee benefits.  Lyons also alleges that Gerhard's terminated its work relationship with him in retaliation after he refused to sign a form stating that he was a subcontractor rather than an employee.  Lyons seeks back pay, front pay, compensatory and punitive damages, attorneys' fees, expert witness fees, interest, and costs.

The parties have resolved these claims.  They jointly move the Court for approval of their settlement agreement pursuant to the Court's duty to ensure that FLSA wage-payment settlements represent "a fair and reasonable resolution of a bona fide dispute."  *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982).  The Court finds that the parties' proposed settlement agreement meets this standard.  It therefore grants the motion and approves the settlement.

# I.

Gerhard's operates a retail appliance business out of several locations in suburban Philadelphia.  (Compl. ¶ 9.)  Gerhard's offers its customers free home delivery for purchases over $999.00 and home delivery for an additional fee for purchases under $999.00.  (*Id.* ¶ 10.)  During the relevant period, Gerhard's utilized approximately eight delivery crews consisting of a lead delivery driver and a helper.  (*Id.* ¶ 14.)  Delivery drivers were expected to report to a Gerhard's warehouse, load their delivery trucks, and depart for customer deliveries by 8:30 a.m.  (*Id.* ¶ 25.)  Gerhard's would provide the drivers with delivery sheets showing the details of each delivery and a delivery route showing the sequence in which they were to make the deliveries.  (*Id.* ¶ 26.)  Gerhard's did not allow delivery crews to perform any additional services that were not listed on the delivery sheets.  (*Id.* ¶ 18.)  Gerhard's trained the delivery crews and required them to wear Gerhard's branded shirts when making deliveries.  (*Id.* ¶¶ 21, 22.)

Lyons worked as a lead delivery driver for Gerhard's.  (*Id.* ¶ 11.)  From May 2005 through the end of 2011, Gerhard's paid Lyons as a W-2 employee.  (*Id.* ¶¶ 11, 12.)  Beginning in 2012, Gerhard's paid Lyons as a 1099 independent contractor even though he did the same work he did as an employee.  (*Id.* ¶ 13.)  As an independent contractor, Gerhard's paid Lyons a flat rate of $40.00 for most deliveries, although the rate could vary depending on the assignment.  (*Id.* ¶ 15.)  Lyons did not record his hours and did not receive additional pay if he worked more than 40 hours in a week.  (*Id.* ¶¶ 45, 47.)  At the end of each day, Gerhard's required Lyons and the other delivery teams to return to Gerhard's and unload any old appliances they had removed from customers' homes.  (*Id.* ¶ 43.)  Gerhard's did not provide Lyons or the other delivery teams with any additional compensation for this work.  (*Id.*)

In July 2014, Gerhard's demanded that Lyons sign a form stating that he served as a subcontractor to Gerhard's rather than as an employee.  (*Id.* ¶¶ 50, 53.)  The form also stated that Lyons was responsible for complying with all income tax laws and maintaining a commercial general liability insurance policy.  (*Id.* ¶ 53.)  It further stated that Lyons was not entitled to any worker's compensation, pension, stock, bonus, profit sharing, health, or other benefits available to Gerhard's employees.  (*Id.*)

Lyons refused to sign the form.  (*Id.* ¶ 54.)  In response, Gerhard's withheld Lyons' pay for several days.  (*Id.*).  On July 28, 2014, Lyons advised Gerhard's in writing that he would not sign the form because he believed that Gerhard's should classify him as an employee rather than as an independent contractor.  (*Id.* ¶ 55.)  Gerhard's terminated its work relationship with Lyons upon receipt of this letter.  (*Id.* ¶ 56.)  Lyons was later able to collect unemployment compensation when a Pennsylvania Unemployment Compensation Board of Review Referee deemed Lyons had been a Gerhard's employee under Pennsylvania law.  (*Id.* ¶ 59.).  Lyons then filed this lawsuit.

After Gerhard's produced "thousands of pages of documents" and the parties deposed Lyons and one of Gerhard's principals, the parties reached a settlement agreement.  (Joint Mot. to Approve Settlement ¶¶ 7, 8, Doc. No. 20.)  Gerhard's has agreed to pay $153,500 to settle Lyons' claims.  (Settlement Agreement & General Release ¶ 1, Doc. No. 20, Ex. A.)  Of that amount, $43,056.25 will go to Lyons as wages subject to tax withholding, $43,056.25 will go to Lyons as non-wage compensatory damages, and $67,387.50 will go to Lyons' attorney for fees and costs. (*Id.*)  Because the agreement involves the settlement of a wage-payment claim under the FLSA, the Court examines the agreement to ensure that it represents "a fair and reasonable resolution of a bona fide dispute."  *Lynn's Food Stores, Inc.*, 679 F.2d at 1355.

## II.

"[T]he FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive a fair day's pay for a fair day's work . . . ." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quotation omitted). Its central purpose is "to protect all covered workers from substandard wages and oppressive working hours, labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers." *Id.* (quotation omitted). An employee's right to a minimum wage and overtime pay under the FLSA "cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Id.* at 740 (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)).

Courts play an important role in ensuring that plaintiffs in FLSA lawsuits do not effectively waive their statutory rights. To that end, "[w]hen employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness." [1] *Lynn's Food Stores, Inc.*, 679 F.2d at 1353. The reviewing court must ensure that the proposed settlement reflects "a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by the employer's overreaching." *Id.* at 1354.

There is also "a strong presumption in favor of keeping settlement agreements in FLSA wage-settlement cases unsealed and available for public view." *Cuttic v. Crozer-Chester Med. Ctr.*, 868 F. Supp. 2d 464, 467 (E.D. Pa. 2012); *see also Tran v. Thai*, No. H-08-3650, 2009 WL

---

[1]    Although the Third Circuit has not addressed whether parties can settle FLSA actions claiming unpaid wages without court approval, district courts within the Circuit have followed the approach endorsed by a majority of courts and assumed that judicial approval is necessary. *See Bettger v. Crossmark, Inc.*, No. 13-cv-2030, 2015 WL 279754, at *3 (M.D. Pa. Jan. 22, 2015) (collecting cases).

2477653, at *1 (S.D. Tex. Aug. 12, 2009) ("The presumption of public access to settlements of FLSA actions is particularly strong."). This openness furthers "Congress's intent both to advance employees' awareness of their FLSA rights and to ensure pervasive implementation of the FLSA in the workplace." *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1245 (M.D. Fla. 2010). Therefore, courts should require that parties file proposed settlements on the public docket unless there are very compelling reasons to override the strong presumption that FLSA settlements should be available for public view. *See Weismantle v. Jali*, No. 13-cv-01087, 2015 WL 1866190, at *2 (W.D. Pa. Apr. 23, 2015) ("[A]bsent something very special in a very specific case which generates a very good reason above and beyond the desire of the parties to keep the terms of an FLSA settlement out of the public's view, if the parties want the Court to approve the substance of an FLSA settlement agreement, it cannot be filed under seal.")

Here, the parties initially filed a joint petition to approve their settlement agreement, but submitted the proposed agreement to the Court ostensibly under seal for *in camera* review. (*See* Joint Pet. for Settlement Approval, Doc. No. 18.) The parties, however, articulated *no reasons* why the Court should disregard the strong presumption of openness, let alone compelling reasons for it to do so. (*See id.*) The Court accordingly declined to review the agreement *in camera* and ordered the parties to file their agreement on the public docket if they wanted the Court to review and potentially approve it. (*See* Order, Doc. No. 19.) The parties did so, filing another joint motion for approval of their settlement agreement with the proposed agreement attached as an exhibit. (Doc. No. 20.) The Court then held a hearing on the motion in open court. (Doc. No. 22.) The proposed settlement agreement is therefore properly before the Court for review.

Courts presented with a proposed settlement of an FLSA claim engage in a two-part analysis. First, the Court must determine if the settlement is fair and reasonable to the employee

or employees involved.  *See McGee v. Ann's Choice, Inc.*, No. 12-cv-2664, 2014 WL 2514582, at

*2 (E.D. Pa. June 4, 2014).  If it is, the Court next considers "whether the agreement furthers or

impermissibly frustrates the implementation of FLSA in the workplace."  *Id.*

When evaluating whether a proposed settlement is fair and reasonable, courts in the Third

Circuit often turn to the nine-factor test for evaluating proposed class action settlement

agreements.  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also, e.g.*, *In re Chickie's*

*& Pete's Wage & Hour Litig.*, No. 12-cv-6820, 2014 WL 911718, at *3 (E.D. Pa. Mar. 7, 2014).

The nine factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of
> the class to the settlement; (3) stage of the proceedings and the amount of
> discovery completed; (4) risks of establishing liability; (5) risk of establishing
> damages; (6) risk of maintaining the class action through the trial; (7) ability of
> the defendants to withstand a greater judgment; (8) the range of reasonableness of
> the settlement fund in light of the best possible recovery; and (9) the range of
> reasonableness of the settlement fund to a possible recovery in light of all the
> attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (quotation omitted).  The Court reviews the fairness of the parties'

proposed settlement agreement under these factors, bearing in mind that Lyons asserts his claims

individually, not on behalf of a class.

### III.
### A.

The Court finds that the proposed settlement agreement is fair and reasonable in light of

the *Girsh* factors.  Further litigation will be expensive and carries substantial risk for both sides.

Lyons, of course, faces the initial hurdle of establishing that Gerhard's should have classified him

as an employee rather than as an independent contractor.  If he clears that hurdle, he faces

substantial risk in establishing the amount of damages to which he is entitled.  Lyons did not

record his hours.  Therefore, establishing the amount of overtime wages due would involve

complex recreations of the delivery routes using map and traffic data.  This data would have to

be complied and analyzed for a 26-month period during which Lyons was allegedly

misclassified.  This recreation would involve the retention of experts at considerable expense.[2]

 Moreover, the parties sufficiently developed the factual record in the case to allow them

to assess the strengths and weaknesses of their respective cases and formulate a settlement offer

that reflected those strengths and weaknesses.  Gerhard's produced between 11,000 and 12,000

pages of documents and deposed Lyons.  (Hr'g Tr. 13:21-22; 20:20-21.)  Lyons deposed Charles

Gerhard, Gerhard's president and operations manager.  (*Id.* 20:21-22.)  Although Lyons initially

anticipated deposing Gerhard's other principals and several current or former employees, Lyons'

counsel believed that Charles Gerhard covered all of the key topics in his deposition, so that he

had "enough of a feel" for the case to formulate and assess a settlement offer.  (*Id.* 26:15-18.)

Indeed, when counsel exchanged settlement offers at the conclusion of these depositions, they

were "within a stone's throw of the same number as the appropriate number for settlement" for

their respective clients.  (*Id.* 26:20-27:1.)

 Based on the documents, depositions, and information he received from his client, Lyons'

counsel figured that Lyons would have made approximately $43,000 per year (without overtime)

had he been classified as a full-time employee.  (*Id.* 30:24-31:4.)  As an independent contractor,

he made about $27,000 after expenses.  (*Id.* 28:17-19.)  About half of the settlement amount

going to Lyons represents this difference extended over the 26-month period Lyons was allegedly

misclassified.  The other half represents Lyons' overtime claim, lost wages for his retaliation

---

[2] Both parties retained consulting experts to analyze subsets of the delivery data to get a general idea of the amount of overtime wages due so that they could make an informed decision on a settlement amount.  (Hr'g Tr. 11:1-12; 21:21-25.)  Those subsets, however, were not necessarily representative of the entire period over which Lyons was allegedly misclassified.  (*Id.* 12:18-13:10.)  As a result, Lyons would have to obtain additional and more expensive expert analysis to establish his overtime wages with the certainty required at trial.  (*Id.*)  Gerhard's would have to obtain an expert witness to rebut that calculation.  (*Id.* 21:21-25.)

claim, and compensation for his ERISA claim.  (*Id.* 31:21-25.)  The Court finds this settlement amount to be well informed and reasonable under the circumstances.

The settlement agreement includes $67,387.50 for attorneys' fees and costs.  This represents approximately 44% of the total settlement amount of $153,500.  As a percentage of the total recovery, this fee is on the higher side, but it is not so high as to be unreasonable.  Courts approving attorneys' fees in class action settlements have found slightly higher percentages reasonable.  *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995) (noting that "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund").  Furthermore, at the fairness hearing, Lyons' counsel attested that the amount due to him under the settlement agreement includes nearly $6,000 in costs, leaving approximately $60,000 for fees.  This represents 39% of the total settlement for fees.  (Hr'g Tr. 35:24-36:3.)

Lyons' counsel further attested that he had devoted 92 hours to the case up to that point, a reasonable amount of time given the complexity of the case, the number of documents produced, and the number of depositions taken.  (*Id.* 36:25-37:1.)  This works out to a rate just over $650 per hour.  Lyons' counsel has been a practicing attorney for over 25 years and devotes approximately 95% of his practice to employment law cases.  (*Id.* 3:22-25.)  The Philadelphia Community Legal Services attorney fee schedule lists an hourly rate range of $600-$650 for an attorney with this amount of experience, which is in line with what Lyons' counsel will be effectively receiving for his work in this case.[3]  The Court accordingly finds that the proposed

---

[3]        "The fee schedule established by Community Legal Services, Inc. ('CLS') has been approvingly cited by the Third Circuit as being well developed and has been found by the Eastern District of Pennsylvania to be a fair reflection of the prevailing market rates in Philadelphia."  *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001) (quotation omitted).  The CLS fee schedule is available at http://clsphila.org/about-cls/attorney-fees.

settlement agreement, including the amount designated as attorneys' fees and costs, is fair and reasonable.

## B.

The Court also finds that the agreement does not impermissibly frustrate the implementation of the FLSA in the workplace. The agreement does not contain a confidentiality provision that would prevent either party from publicly discussing its terms. The agreement does contain a "nondisparagement" provision that prevents either party from making any "negative, critical or adverse" remarks about the other unless testifying truthfully under oath. (Settlement Agreement & General Release ¶ 12.) This provision, however, does not preclude Lyons from discussing his claims against Gerhard's or the terms of the settlement agreement. As such, it is not so restrictive that it frustrates the purpose of the FLSA. *See, e.g.*, *In re Chickie's & Pete's*, 2014 WL 911718, at *3 (approving settlement agreement with confidentiality clause that "only prohibits Plaintiffs from disparaging Defendants or discussing the substance and negotiations of this matter with the press and media.").

## V.

In conclusion, the Court finds that the proposed settlement agreement reflects a fair and reasonable compromise of a bona fide dispute and does not impermissibly frustrate the implementation of the FLSA in the workplace. The Court accordingly grants the parties' joint motion to approve settlement agreement.

An appropriate order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.